May it please the Court, Harini Raghupathy, Federal Defenders of San Diego, for the Appellant, Mr. Jonathan Leal-Del Carmen. When the District Court excluded Ms. Garcia's exculpatory eyewitness statements and denied the proposed missing witness instruction, it violated Mr. Leal's constitutional right to present a complete defense. As this Court explained recently in Stever, whether rooted in the Sixth Amendment's guarantee of compulsory process or the Fifth Amendment's guarantee of due process, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. That right includes, at a minimum, the right to put before the jury evidence that might influence the jury's determination of guilt. Here, the government concedes in numerous points throughout its brief that Ms. Garcia's statements were helpful to the defense and that they were therefore evidence that might influence the jury's determination of Mr. Leal's guilt or innocence. Even without this concession, however, it's clear that Ms. Garcia's statements were helpful and central to Mr. Leal's defense. He sought to defend on the grounds that he was not one of the two foot guides, but one of the smuggled aliens seeking a better life in the United States. And Ms. Garcia's precipient eyewitness testimony would have allowed him to centrally advance that defense. Ms. Garcia recognized Mr. Leal as present among the group of aliens with whom she traveled and was able to pick him out of a photographic lineup. But when asked whether Mr. Leal gave orders, she stated no and then reaffirmed that answer two more times. Well, as that conversation goes on, as I recollect what she said, she said, I don't know. Not he didn't give orders, but I don't know whether he gave orders. Am I misremembering? Well, the quoted conversation is on page three, 19 of the E.R. And there the border patrol agent asked her if you get Mr. Leal. First, she picks out Mr. Leal out of the photographic lineup. And then he asked her, what did he do? Did he give orders? What did he do? She says, no, he didn't give orders. The agent then says, sure. What did he do in this event? Oh, I don't know. It is that I wasn't looking. I was with my boyfriend at all times. Correct. And then the next five or six lines, the agent goes on. But he, number five, referring to. Well, the next thing she says is, no, he didn't give orders. Then the next thing is, no, he did not give orders. No, no. It is who gave orders. It is that I don't know. So she says no, but she also says I don't know. Well, she says he didn't give orders, which is distinct from saying I don't know who gave the orders. So although she wasn't able to identify who gave the orders, she was able to say affirmatively and then repeat two more times that it was not Mr. Leal who gave the orders. And I think when coupled with the fact that she was able to pick Mr. Leal up out of the photographic lineup, she recognized him as one of his travel companions. But she said he didn't give orders. While she wasn't able to identify who the individual was that gave orders, the fact that she said Mr. Leal didn't give orders is still exculpatory. Then she says, what did number five do? Because you do remember him. What was he doing? Well, it is that I don't know. You don't know what you call what he was doing? No, it is that I don't know if he, I don't know what was it that he did. I would see that he was going in the unintelligible, but I don't know. Well, I think Your Honor's points are getting to the fact that perhaps Ms. Garcia's statements were somewhat evasive when she was answering other questions. But I think as this Court has explained in Vallejo, evidence that tends to show that another person committed the crime in question, even if it seems somewhat speculative or fantastic, if it creates a reasonable doubt, it's evidence that should be put before the jury. And it's ultimately the jury's determination to decide if that reasonable doubt is speculative or fantastic. Here the jury was instructed on the definition of reasonable doubt and that in order to convict, it would have to find that the evidence was beyond a reasonable doubt. So really the only, as this Court explained in Stever, the only risk here was that the jury would not follow the reasonable doubt instructions that were given. But, of course, this Court presumes that juries heed very closely to the instructions that were given. So, and I see that. What's the standard on which we, assuming that she should have been kept in the United States or if she wasn't kept in the United States, that the transcript or the tape should have been allowed into evidence. What's the standard of harmlessness by which we judge the consequence of the error? Well, here we're raising a constitutional error that the district court's cumulative error starting from the very beginning with the denial of the motion to dismiss the indictment, then with the denial of the motion in Luminae leading to the denial of the missing witness instruction was a constitutional error. So the prejudice inquiry would be the Chapman standard of harmlessness beyond a reasonable doubt. And here there's two reasons why the government cannot show that the cumulative errors were harmless beyond a reasonable doubt. First, the jury acquitted Mr. Leal of the financial gain counts, which suggests that the case was far from overwhelming. But more importantly, it suggests that the jury disbelieved at least part of the material witness testimony relating to the financial arrangements they made. So the jury already rejected part of the material witness testimony, which was a central part of the government's case in chief. Had Mr. Leal had access either to Ms. Garcia as a witness or her statements or a missing witness instruction, it's more likely than not that that would have caused the jury to And then second, in closing argument, the government actually capitalized on Mr. Leal's inability to call Ms. Garcia as a witness or to get her statements introduced or to receive a missing witness instruction. The prosecutor argued in closing that the three material witnesses presented a 100 percent identification rate. He stated, this is at ER 139 in closing, the three material witnesses, quote, were taken out of the cell at the time of their apprehension. Who guided me? He guided me. Next one. Who guided you? He guided me. Each of the three. So three out of three. That's a 100 percent identification. A 100 percent identification for Mr. Leal, end quote. So without access either to Ms. Garcia as a witness or her statements or the missing witness instruction, defense counsel was powerless to rebut that argument. But had defense counsel had access either to the statements or the instruction, it could have argued that there was, in fact, a fourth witness out there who, despite recognizing Mr. Leal as a travel companion, was actually unable to identify him as one of the two guides. So I think here, as in Stever, we see that the errors directly prejudiced Mr. Leal's defense because he was confined just to poking holes in the government's case-in-chief and holding the government to its burden of proof. So for these reasons, Mr. Leal's convictions must be reversed. And I'd like to reserve the remaining time. Do you have your excerpts of record there? Sorry? Do you have your excerpts of record? Yes, I do. On the version of excerpts that I have, the pages, the pagination is cut off. Does it appear on your pages? My pages. Look at page 319, for example. Yes. Does this 319 appear there? Yeah, 319 appears on my. It doesn't appear on mine. It doesn't appear on Judge Fletcher's. Okay. Okay, so these are not conforming. Your name goes on them, so you are responsible. Okay. Okay? It doesn't help your client. It doesn't help the court when these, when the excerpts of record. Good. Did you check these yourself? I believe I did, but I didn't catch that error. I apologize. All of my volumes are like that. Here, want to take a look? I believe, Your Honor, I didn't. No, no. I have to believe that you opened this up and followed it this way. Okay, I would like you to advise folks in your office that this is happening. So I don't know what the problem is here, but whoever is doing these things is not doing their clients a favor. Again, I apologize. I don't want to see this again. Okay. Okay? Mr. Kerner. Yes, David Kerner for the United States. I'd just like to make, before I begin, I'd just like to make a couple general observations about Ms. Garcia. As we put in our brief. Why don't you just go ahead with your argument instead of making general observations? We've got issues on appeal. All right, well. If you think you've got something to say that's relevant to the issues, go ahead. Well, I do, because it pertains particularly to the statement that defense counsel touts as being the statement that would produce a totally different result in this case. And that is that this is a young woman who is out wandering around in the hills of East San Diego County in the dark. And as far as what she was thinking about or what she was doing at that point in time. If it's not very important, why did the government oppose putting in, they had a videotape of her statement, and if it's not that useful or not that damaging or not that helpful to the defense, why does the government oppose having it shown to the jury? So they can make up their minds as to whether she is or is not, or she's a young woman or an old woman, or whether she's wandering or whether she's, you know, whatever. The reason we oppose it is that we don't want to get ourselves into a situation where, just because defense counsel wants to put in a statement that is clearly hearsay in their defense, we're not going to roll over and just say you can do it. Why? It was clearly hearsay. There was no reason, there was no opportunity to cross examine a woman at the time by the government counsel. What reason do you have to oppose it? I don't understand. If it's not that helpful, I mean, I have to view with some suspicion your claim that this is not important if the government makes a bigger deal of it and says no, you know, it shouldn't be admitted. It was totally irrelevant. It was irrelevant to the defense. Come on, this is Judge Fletcher. You can say that it's not that critical, but totally irrelevant just is not true. Yeah, certainly not. The statement that she makes, as was pointed out at the beginning, that he did not give orders. That's the only thing that she says, and then everything else she says is, I don't remember, I was paying attention to my boyfriend, I don't know, I don't know, I don't know, and there was a tremendous amount of uncontradicted evidence that this particular defendant She doesn't say that she doesn't know about whether he gave orders. That's true. It's quite clear. Three times she says he didn't give orders. That's right, and so did her boyfriend. Her boyfriend said exactly the same thing. And that was coming in, and that came into evidence through his deposition. But you're not answering my question. If it's cumulative, if it's as you claim, why not just let it in? Why, after having the government having made the witness unavailable, this was before, was a witness removed before a defendant had a lawyer? Yes, she was. But the government didn't do that intentionally. The government did that along with eight other of the aliens as well. You remember Ramirez Lopez? You remember Ramirez Lopez? You did that once, and you had the egg on your face. Why do you keep doing stuff like that? Are you talking about Sanchez? No, no, Ramirez Lopez. That was the case where we affirmed the conviction, and the government petitioned for a hearing and asked us to vacate the opinion because they were so embarrassed by having removed the aliens? Well, you know the case. Well, I know there are cases out there, such as Sanchez, where all the aliens were sent out or were deported. That's true. But we are, under Valenzuelo Bernal, we are under no obligation to keep all the aliens. You know, if I were to listen to Judge Fletcher again, if this were to come up in a slightly different context, let's assume we don't have aliens outside the country. We have everybody in the country and potentially available to testify. If the government had this tape in its possession and had refused to hand it over, it seems to me that would clearly be a Brady violation. Do you agree? Oh, yes, that's true. Okay, so in other words, this tape is potentially very helpful and the testimony of this witness sufficiently helpful that it would be a Brady violation not to turn it over. I would say you're correct. You say I'm correct? I'm sorry. No, I would say so, yes. Okay, and if that's true. And if this were a private party and they hid the tape or made the witness unavailable, you'd prosecute them for obstruction of justice, right? Well, there are a lot of things that go into that kind of thing. Well, I don't know. I mean, if it's a witness that's this relevant and they make him unavailable, you're investigating a company and they make a witness unavailable and they send them off to Japan or someplace out of their jurisdiction, you would prosecute them for obstruction of justice. Well, I'm not going to concede that. I'm not going to say that we're going to do that. What I'm saying is... Well, I think you have to. That is, in the situation in which I hypothesize, not to reveal this tape would be a Brady violation. Well, that's true. We did reveal the witness. Excuse me. I'm still talking. You couldn't hear. Given that, it's hard for me to understand how the government should be able to deport somebody whose concealing would be a Brady violation and then through the deportation make that witness unavailable. And when the tape is sought to be introduced because you can't get your hands on the witness, then object to the tape. So my problem is whether this is harmless error, not whether it's error. I mean, it seems to me that you clearly did something you shouldn't have... You, the government, clearly did something that you should not have done. Well, you do it on a continuing basis. I mean, Ramirez-Lopez was not so many years ago. It was less than ten years ago. And, you know, you did it then, and you got egg on your face. You had to concede you were wrong, and now you're doing it again. I mean, this is quite a pattern. But that's why, well, I disagree. That's why you have Dring and Valenzuela-Bernal. That you have to show that it was done in bad faith. And there's been no showing that this was done in bad faith. Bad faith is hard to show. But if we allow this to go forward and continue as a normal practice, what happens is you get to get rid of witnesses that are potentially helpful, maybe very helpful, maybe only a little bit helpful to the defense. Those witnesses are not able to testify in person. Their testimony is not able to come in by tape or video. And then you're in a position, not having to convince the jury, but you're in a position of resisting the government that bears a fairly heavy burden of proof on harmlessness of error. I mean, that gives you an advantage that I don't think you should have. Well, what you're basically suggesting is that war patrol agents who are trying to decide how many of many, many illegal aliens should be kept and who should be deported. Well, how many did you keep that were government witnesses? They kept one. The government only put on one witness? No. They had depositions of two others who were then released. And those were all introduced? Those were introduced. And didn't they say basically the same thing? Well, yeah, absolutely. The same thing as the woman? No, no, not the same thing as the woman. The boyfriend certainly did. And the other witness, Ramirez-Hakim, said virtually the same thing. But her boyfriend, Gonzalez-Ramirez, said the same thing. And I would also suggest that. He said the same thing as what? That he didn't give any orders. They didn't see him give any orders. And you put that on? Absolutely. Well, you also put on the boyfriend's testimony that he met with the defendant when they got off the bus. That's right. Which was damning to the defendant, of course. Of course it was. But the woman was never asked that. Well, of course, because she wasn't asked by the defense lawyer, right? It was all the agents trying to get the inculpatory evidence. Why was there evidence of the other two witnesses come in? Why wasn't that hearsay? And how was their evidence submitted when hers was excluded? Well, because those were two depositions in which both the government and defense counsel were present. Oh, I see. So they were released afterwards, after the lawyer was. . . He was given a deposition. He was given a deposition. And I would also like to throw this out, also, as well. That by the time those depositions were taken, or they wanted to take those depositions, all the witnesses' statements had to have been released to include Ms. Garcia. And if defense counsel really wanted to know where she was, why didn't they ask her boyfriend where she was? I mean, if anybody in this world knew where she was, it was the boyfriend. Did the government get her address before they released her? No, they did not. But the boyfriend, obviously. . . Why is that? Did they get contact information? No. Well, apparently they did not. Well, let me ask you this. How long before a lawyer was appointed in this case, a defense lawyer? It's usually 48 hours. Obviously, at the time of the arraignment. Which is 48 hours? Well, how long? Sure. Well, I don't have the exact date, but it was obviously within a very short period of time. And so she was sent back before that happened? Yes. Now, what's the hurry to send back these witnesses in the short time it takes to appoint a lawyer and have the lawyer be able to make a judgment as to whether the witnesses should be sent back or retained? Well, to be honest with you, I think we've been through this. . . Well, I would like you to be honest. . . so many, many times before. And that is that if we were . . . and that's Valenzuela Bernal saying that we don't have to keep everybody, that we simply don't have the bed space to keep that many illegal aliens around while the defense counsel decides whether or not to take the depositions or not. I mean, there are times when we arrest 30, 40, 50 aliens at a time. And . . . How many statements did you take from this group of . . . I guess 12 went back? Well, no, not 12. No, nine went back. There's a total group of . . . It would be nine went back. Yeah, nine went back. And how many of them did you take statements from? I don't have that number. Obviously, we took the video statement of Ms. Garcia. Yes. But I don't know any other. And the three others you kept. Well, I . . . You know, it doesn't take a genius, once you've got the statement from Ms. Garcia, to know that that's a statement that is helpful to the defendant. Would you agree with that? I . . . it's marginally helpful, yes. So it's not irrelevant, as you said before. No, no, no, no. I have said, and I've said in our brief, that it's marginally helpful. And having seen that it's helpful, it seems to me . . . I'm not going to say bad faith, but it does not seem to me as though it's playing very fair to send back and, in effect, make unavailable a helpful witness, when you know anybody reading that transcript or listening to the interview knows that it's helpful. Well, but we also knew that her boyfriend, Gonzales Ramirez, said the same thing. You know . . . Well, why didn't you keep her and send him back? Because he had more information. He had inculpatory information. Well, you're right, and she was . . . And her information was only . . . And her statement . . . And her information, to the extent that you had it, was only exculpatory. I understand perfectly why you sent her back. Her information was filled with, I don't know, I don't remember, I was paying attention to my boyfriend. It's also filled with, no, he didn't give orders. Well, no, it wasn't filled with that. There's one little snippet in there where she says that. We've read it as well as you've read it. Page 319 of the ER. That's exactly right. And I believe you pointed out at the beginning of the argument that directly after she said those things, she also said, I don't know, I don't know what number five was doing. Do you have the video deposition? Has it been filed? I don't believe . . . Well, I don't believe so. Okay, well, you will though, right, in the next 48 hours? File the video of the deposition? That's right. I will make every effort to get that done, yes. You can get an extension of time if you can do it within that time. Okay. All right. Yes, I'd be happy to do that. Okay, I'm sure you will be. Okay, we'll give you a minute for rebuttal. I'd just like to make two points in rebuttal. One is with regard to the issue of harmlessness. Again, as I mentioned, given the cumulative errors here, I believe that the correct inquiry is harmlessness beyond a reasonable doubt. And here again, the government, as I said in closing argument, exploited Mr. Leal's inability to put forth this evidence by arguing that there was a 100% identification rate, which is clearly incorrect, given that Ms. Garcia was a fourth witness out in the world who was unable to identify him. And then I think, again, the acquittal on the financial gain counts is important to consider. And then lastly, I'd just like to address the issue of whether all of the material witness testimony overlapped with Ms. Garcia. That's clearly incorrect. All three material witnesses testified that Mr. Leal gave orders, that they met Mr. Leal, at least one of them met Mr. Leal and directly made financial arrangements with him, that he told them after crossing the border to go to a particular location and hide. So I think to say her statements are cumulative is actually a misreading of the record. And again, I'd ask that Mr. Leal's conviction be reversed. Thank you. What exactly are you sort of reversed and what? I mean, so what do you get from that? I mean, you just do a do-over? Yeah, a remand for a new trial. Well, but, you know, the witness is not here, so you can't have her. Correct. But I think that her statements, either the transcript, ideally it would be the video statement so that the jury could assess her. So that's what you're asking for. You're asking for a vacating of the current conviction and a retrial with admission of the video testimony. Yes. I'm not trying to put words in your mouth. I just like to make sure I understand. Because it doesn't do you any good to send it back and have it, Because, you know, a jury will come out to exactly the same conclusion on the same evidence. I mean, there's no doubt about that. Correct. Ideally, we would want the opportunity to call her as a witness if we were able to, if the government were able to identify her whereabouts. And if the government can't find her, then what? Then, as I mentioned, I think that the next best thing would be for her audio and video recording to come in as substantive evidence at trial and have the jury be able to assess her statements as part of the defense. Or would you want a missing witness instruction? What is exactly the full relief you would want? Well, once her statements came in, that would provide the appropriate evidentiary basis for a missing witness instruction as counsel requested in the initial trial. So I think it would be, as I said, since we most likely would not be able to have her come in as a witness, it would be her audio and video recording, ideally her video recording, plus a missing witness, the request, and hopefully the granting of a missing witness instruction. What about her? I don't remember asking for her in your brief. We asked for her. In the brief, it said to reverse Mr. Leal's convictions and remand for retrial. It didn't specify, I believe, what evidence would be introduced at the retrial. You didn't ask for reversal and dismissal, right? No. You want to ask for it now? Yes, please. I thought you might. Or one thing that occurs to me, I mean the government's argument against admitting the tape or the transcript is that she's not available for cross-examination. Maybe there's an argument because the government by its own action has made her unavailable, the government should not be able to object to the introduction of the tape on grounds that it can't cross-examine her because it's the government's own action that has made that cross-examination impossible. Well, I think I would have two points to that. One is that this Court confronted the very same situation in United States v. Sanchez-Lima where there was material witness testimony that it held should have been admitted under the residual clause, Rule 807 of the Federal Rules. And there it was the same situation. The prosecutors didn't have an opportunity to question the material witnesses, but this Court held that it would still promote the interest of justice to introduce that evidence. I'm sorry, this Court held. It held it would still promote the interest of justice to introduce that evidence because cross-examination isn't required in every situation. Okay. May I respond to Sanchez-Lima? Because that was not brought up in her argument. Well, in her brief, she asked for, she said the District Court committed reversible error when it denied the motion to dismiss the indictment. That's one whole section heading. So tell me, I'm a little surprised at this kind of stuff. Does this go on all the time in Southern District where witnesses get sent back? In your experience? In my experience, which has only been a year, I can't really comment. This has been my first case dealing with this issue. Having talked to my co-workers, however, I get the sense that it happens, I wouldn't say frequently, but to some degree. But, again, I've only had a few. You're familiar with what happened in Ramirez-Lopez? Yes. In 2003. You were probably still in high school when that happened. College. I'm just a little surprised that this is continuing to go on. But, I mean, this sounds to me like a recurring problem where witnesses get interviewed, they then get sent back before a lawyer is appointed. It would be sort of useful to know what to give our way of guidance for future cases. What is your position? Well, I think, as Your Honor alluded to earlier, at the very least, I think, well, Mr. Kernow is right that Valenzuela Bernal does not require the government to keep every witness. I think, at the very least, witnesses should be retained for the 48 hours until the arraignment occurs, when the defendant has an ability to meet with his lawyer, especially when the evidence is exculpatory on his face, as the case here. If someone says he didn't give orders, I think there's no reason why the Border Patrol officials should not know that that is exculpatory information. So I think, at the very least, witnesses should be kept until a defense counsel is appointed. Well, it can't just be until a defense counsel is appointed because the poor lawyer is, I don't know how this is done in the Southern District, but in D.C. when I used to do it, you know, you showed up and they called your name and said, here's your client. So you had about 10 minutes to go down to lock up and talk to the client. I assume that's not all that different, right? That's correct. So you need some period afterwards to figure it out. Well, I think until defense counsel is appointed but also has the ability to determine what that information is. It's a practical matter. See, again, I don't know what the mechanics are. As a practical matter, if we were to, I don't know if we will, but I'm just saying if we were to craft a rule for how this should be done in the future to avoid this problem, what would we say, another 24 hours, another 48 hours? What would we say? How long do these witnesses have to be kept after counsel is appointed? I'm not sure if it would be the best way to frame it would be in terms of a temporal designation  Well, the nice thing about a temporal designation is that you can tell when it's over. So if the clock runs down and, bam, it's over, you don't have to have a fight every time as to whether it was a reasonable amount of time or not. Your Honor, on behalf of the government, I need to speak to that. I think that It's not your turn. Okay. I'm trying to defend the government's interest in that particular situation. I understand, but you will be quiet right now because I've asked counsel a question. Well, I think if the court were inclined to impose a temporal limit, generally the defense counsel is required to meet and have an initial client interaction within 24 hours of being appointed. So I think there would be the 48 hours until counsel is appointed and then the additional 24 hours, which would be 36 hours at the least. Is it 48 hours invariably? As far as I don't know. I'm not positive. Is it weekends and Fourth of July, Christmas Day? There is exceptions for holidays and weekends. I'm not fully aware of what those are at this moment, so I don't want to comment incorrectly. But I think, in general, it's 48 hours. And then, as I said, it takes defense counsel is supposed to meet with clients 24 hours after that. Is there any requirement that the government notify defense counsel as to persons it proposes to deport? Not that I am aware of, except that if the witness possesses exculpatory information, that would be a different situation because that's Brady material.  You know, I noticed that you did not make a Brady argument in your brief. It does seem to me that there's at least a plausible argument that what the government did here is a Brady violation. It knows that it has information or that knows that it has a witness, Mrs. Garcia, who has exculpatory information and it makes her unavailable. I know you didn't make that argument. If you run into another one of these cases, you may wish to make it. Okay, thank you. We'll hear from Mr. Koerner. We'll give you two minutes to say whatever's on your mind, Mr. Koerner. All right. First, with regard to Sanchez Lima, in that case, the government counsel didn't cross-examine because the government counsel was given a chance to do that and chose not to show up in Mexico. Secondly, with regard to coming up with some plan on how all these witnesses should be handled, I'm suggesting there are not enough facts in this record to make any kind of a plan up, and if that's going to be done by this court, that there should be a whole hearing on that, wholly separate, so that all the facts can be put before this court as to how the procedures take place because there's nothing in this record that would let this panel make up that kind of a plan. It would be made out of whole cloth, and that just should not happen. Whole cloth is not so bad. What's wrong with whole cloth? Because you don't have anything to work with. Oh, I don't know. Well, I suggest that... I can add numbers. I mean, you've got 52 seconds left. Do you want to stay in the government's position in case we... Yes, the government's position is that this court should not come up with some plan as to how we should handle potential material witnesses or illegal aliens, and I think that the cases have already spoken to that as to what we can and cannot do, and we've been following those patterns per case law for years, and there's no reason to change that without... There should be a full-blown hearing on that in the district court so that all the facts can come forth from which a plan can be devised. Well, you go back and read Amiris Lopez. You guys didn't learn your lesson then, so I don't know. But you've got four seconds left. Do you give us a time, how long, in case we do do the unthinkable and do impose a plan? I'm not going to suggest anything because I don't have enough to work with. I'm asking you, do you want to come up with a figure? How long, 24 hours, 48 hours after appointment of counsel? No, I'm not going to come up with a number because I don't have enough facts before me to do that. Fair enough. Okay, thank you. Case is argued, stand submitted. Thank you. Next argument, United States v. Rodriguez Arroyo. Thank you.
judges: Kozinski, Reinhardt, Fletcher